Good morning, Your Honors. Michelle Bettencourt, Federal Defenders of San Diego, on behalf of Mr. Bravo-Muzquiz, a defendant appellant. The main issue in this case that requires reversal depends on the definition of illegally or unlawfully in the United States as it pertains to 18 U.S.C. 922-G5. Thus, the threshold issue before this Court is whether release on bond pursuant to an immigration bond constitutes being present in the United States with authorization. Now, this Court has not specifically addressed whether release on bond constitutes being in the United States lawfully or illegally, moreover not whether it's with authorization. The one case that the Ninth Circuit has looked at is United States v. Garcia. That was a very narrow decision that did not articulate exactly what the definition of illegally or unlawfully in the United States should be. In that case, Garcia admitted to being in the country illegally. Additionally, he did not apply for relief until two days after he had been indicted for possession of a firearm. He had not indicated that he was on bond. So I think factually it's different from the position that Mr. Bravo-Muzquiz finds himself and, again, does not go to what the definition of illegally or unlawfully is. The government cites the same cases that we cited to in our opening brief. However, I think that the government mischaracterizes the cases from out of circuit. Those cases are looking to whether a person has permission to remain in the United States. And one of the things that they're looking at is whether the individual had permission. And, again, one of the things that they turn to is was there an application pending for them. And Hernandez itself lays out the legal principle that should be applied in all cases. Does a person have permission to be here so that they are not going to be deported? And in this case, Mr. Bravo-Muzquiz was given a bond pursuant to an immigration court where he could not be deported. He was given permission to remain in the United States throughout the duration of his immigration proceedings pursuant to that bond. And what was the nature of the proceedings he was in at the time when he was released on the bond? He was given a notice to appear for not having permission to remain in the United States. So essentially he was going to show up for a hearing as to whether or not he would be deported? Correct, Your Honor. And how did the release on bond come to be? He made a showing that he was not a danger to the community, that one of the things that the courts oftentimes take into consideration, this is not in the record, but whether the person has potential relief available to him. And in fact, Mr. Bravo was granted relief by an immigration judge, and that relief actually is pending on appeal. The government appealed the granted relief by the immigration judge. Based on this conviction? Yes. Well, he was granted relief, then indicted on this case, and then that case was just kind of hanging in the wings, waiting for this case to be resolved. What was the basis of his relief? He was granted cancellation of removal for – cancellation of removal. He was married to a lawful permanent resident, Ms. Anna Bobadilla, and showed that he had good moral character, and the judge made the determination. Even though the INS officer in that case tried to show the possession of these guns, he still the judge made a determination that he did merit and deserve cancellation of removal in that case. Is this a case of first impression, considering whether the release on bond is an authority, an authorization to remain pending the hearing? It is to the extent that there hasn't been any case, not in the circuit or other circuits, that have specifically addressed whether the – just the release on bond is sufficient to warrant some – to constitute someone being with authorization in the United States. And I would say that it is, Your Honor. And the reason is that it seems – the government makes comments about the result being absurd, but I think it's absurd to think that Mr. Moosky's – Mr. Raba Moosky's would be given permission to remain in the United States, not be able to leave because he forfeits his bond, forfeits any possibility of relief, cannot be deported by an immigration officer, but then the next day say, oh, for purposes of prosecution under 922G5, now he's illegal. So I think that in itself is absurd, and I think release on bond is sufficient to constitute for, again, for just purposes of 922G5 and in this case, that he was here with authorization. Well, the problem I see with that is going into the proceeding in which he got the bond, presumably he was here unlawfully. He had no right to be here. That's correct, Your Honor. All right. So the immigration folks have two choices. They can throw him in a detention facility and hold him pending the hearing. Now, clearly, that would not be the same as what you're talking about here on bond, would it? No, Your Honor. He would have no permission to be here. They'd just lock him up. So if they say, well, you can stay if you post a bond, why isn't that about the same as you can stay as long as you don't escape from the holding facility? Well, I think it's different because, Your Honor, he was actually allowed to remain in the United States, walk around the streets. If then given the opportunity to obtain a job with proper permission, he could do so. He can continue supporting his wife. He was given the permission to remain in the United States. And I think it's the condition of stopping the proceeding. If he hadn't posted the bond, he'd have been gone. No, Your Honor. Even if he'd been in custody, the proceedings continue on. Right. But he stopped the proceedings and he stopped the custody. And so I don't see that the bond, which simply puts him out on the street as opposed to puts him in a cell, is really permission to stay in the United States any more than being in the cell is. Well, I think it is different from being in the cell in that he is, again, told he can remain in the United States outside, not in the cell. An immigration judge made the determination that he did not have to remain in that cell, that he did merit being out, that he was not a danger to the community. There were findings made that he could possibly be eligible for relief and, in fact, was given relief. So I think that it's different from someone we have aggravated felons who are not even given the opportunity to ask for bond because we know that their possibilities of relief are almost zero. So they're not even released on bond. Well, who granted the bail? An immigration judge, Your Honor. And it's, I believe it's E.R. 916. Wasn't it Judge Boschwitz? No, Your Honor. He, well, he had two bonds. He had actually an immigration bond where it was posted for $7,500. And then once he was indicted on the federal case, he then posted a second bond through the, he was arraigned in magistrate court. And then I believe it was Judge Stiven set the bond in his case there, Magistrate Judge Stiven. So he had, he actually had two bonds. Not at the time that he went to pick up the gun. At that point, he only had the one bond. He had not been indicted on this case yet. On the immigration bond, you were going to say where it is in the record? It's E.R. 916. Was that your question, Your Honor? I'm sorry. Yes. Yes. It's E.R. 969. And I apologize, it's in Volume 5. I guess the same thing would apply under your view if someone is paroled into the United States pending a determination of whether they should be excluded? Yes, Your Honor. I think it would be somewhat analogous. And the reason being, again, that specifically 922g5 doesn't define what illegally or unlawfully means. And the cases, for example, Hernandez says that it means without authorization. And I'm not saying that we should make his illegal presence lawful. All I'm saying is that pursuant, just for 922g5 purposes, he was present in the United States with authorization. He was given this bond by immigration officials, by the immigration judge. And so I do think that the fact that he could not be deported at that point in time is another important point that should be looked to. And if I may turn to this, unless Your Honor has more questions, I can turn to my second point. I think the second issue here is that the district court erred when it failed to adjust Mr. Brabhamusky's base offense level pursuant to 2K2.1b2. I do have a question, if you're going to leave that first issue. You're familiar with the Otondi case from the Tenth Circuit? Yes, Your Honor. And that, of course, went the other way on your bond issue. Is there some good, compelling reason why we should create a circuit split? Well, Your Honor, that case, again, didn't specifically address, and I don't – I'm not certain how it was argued to the Tenth Circuit, whether they focused purely on the fact that the individual had been on bond. I know that was one of the factors that was taken into consideration, but they never themselves said being on bond is not sufficient. I think there was an issue as to whether the person had been officially removed or not. That was an alternative argument that he made, and they rejected it. So it looked like they did decide it. Yes. They did look to whether being on bond was sufficient or not. And I think, though, that – They said it wasn't. They did. Your Honor, the one thing that I would point to, that Otondi is from the Tenth Circuit, as is Hernandez. Hernandez was not really addressed in detail in Otondi. And Hernandez itself says that one of the things to look to is whether a person can be deported or not. And that's what I'm saying – why I'm saying that. When he was given this bond here in the Ninth Circuit where he was given the bond, he could not be deported at that point in time. Other than that, Your Honor, I don't know if that answers your question. No. I think you realize that Otondi is a stumbling block to where you want to get, I take it. Yes, Your Honor.   I would like to move to 11.17, paragraph 11.1B2 for the fact that Mr. Barrabamuéz prove by a preponderance of evidence that the standard in this case that he possessed the gun in account of conviction solely for sporting purposes. The Ninth Circuit previously has denied, or has affirmed the denial of the adjustment when people possessed the firearms for personal protection or protecting their marijuana crop, as it was in Gavilan. In Lamb, the individual owned a gun for his personal protection, and that was what was on the record. Here, I think the evidence presented outlining the six factors shows that Mr. Muski's Mr. Barrabamuéz did show by a preponderance of the evidence that he possessed the firearms purely for sporting purposes and collection. He was only found in possession of one firearm. There was no ammunition at his home. The location of the firearm was up in a shelf in his bedroom closet. And the nature of his criminal history, two misdemeanors that have nothing to do with violence or anything connected to gun violence. I think one of the things that the government points to the fact that there is evidence that Mr. Muski's pawned one of the firearms, and I'd like to address that briefly, is that two of the cases that the government cites to where it says that they denied the adjustment because the individual had sold or pawned certain guns, and I think it's important to look at that Miller, the Third Circuit case, that person was actually convicted of selling without a license. So in that case, clearly the person wasn't possessing them for collection or sporting purposes. They were convicted of actually selling firearms, so the purpose of their possession was for sale and transfer. Similarly, with Solomon in the Fourth Circuit, that case was not so much reversed because the person had pawned a firearm. There, the Court made clear that they lacked any factual basis for the reduction or for the downward adjustment. And so I think here that the court, the district court, was focusing on the wrong issue when their main question was, well, where are these guns? The question that should be looked at is, what was his purpose when he possessed these firearms? And Your Honors had indicated that you wanted to hear the implications of Blakeley and Amline to this case. I think it does apply in an issue that, unfortunately, was not briefed in the opening brief, but it clearly applies to the plus-two upward adjustment that was given for the actual number of guns. I do want to indicate that. That issue was never presented to a jury. There was never any finding beyond a reasonable doubt by a jury. And the district court just based the upward adjustments based on statements made by Mr. Bravo-Muskies and made by counsel. And I think the government, in their 28-J letter, indicates that, had it been presented to the jury, they definitely would have found it beyond a reasonable doubt. And my response is that I don't think that that would have been the case. The case would have had a completely different light. There wouldn't have been any admissions by Mr. Bravo-Muskies. Counsel would not have made any admissions at sentencing. The objection was made to the number of guns because there wasn't any sufficient evidence of that, but then the district court did find them. So I think, as indicated in Amline's footnote 18, I think, if anything, it does apply to that plus-two adjustment, and those statements made by Mr. Bravo-Muskies should be the district court should be allowed to determine what should be made of those statements. You're not raising, I take it, then, the issue of whether Blakely applies to the question of sporting purposes. Arguably, Your Honor, I would say that it does apply. I think a little bit of the problem is that it's a downward adjustment. But I do think that the Court was relying on the number of guns, which denied him that substantial benefit. So if Your Honors would indulge me, I could submit further briefing on that. I do think that it's something that can be considered. But again, I think there is a bit of a roadblock because it's a downward adjustment. And at this point in time, we do know that, for certain, it applies to upward adjustments. And if I may reserve the remaining five minutes? You may. Thank you. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Your Honors, the district court did not err in instructing the jury on what it meant to be illegally or unlawfully present in the United States for purposes of 18 U.S.C. 922, G5. In this case, the district court first looked at the statute. There was no definition there. Looked to see if there was a model instruction from the Ninth Circuit that wasn't. Did the next best thing. He looked to see what case law there existed that interpreted the statute. And as it turns out, I think there are no more than maybe ten cases from around the country that deal with this specific issue. He gave considered judgment to those cases, and he drew on a theme that is consistently present in all of them. And that is simply this. At the very least, an alien has to have an application for adjustment of status pending at the time he possesses a firearm in order to be found lawfully present. In this case, we know there wasn't even that. Really, the only issue that this Court has to do – this Court doesn't even have to decide necessarily if that was an accurate statement of law. What this Court really only has to decide is whether, and I know defense counsel framed it this way, whether the release on bail pending removal in and of itself renders an alien lawful. And we would definitively say that it doesn't. Does it matter? I mean, if he – I don't have the release in front of me, but I assume he goes – he responds to the notice to appear. He goes in, and I don't know what happens in between that. Does he make his pitch for cancellation of removal? And then – right then, and then he's released because maybe he is eligible for that relief? Nothing like that happens in the proceeding. No, and I'm glad you asked that, because one of the things I wanted to point out, I think – I don't know if I heard defense counsel right, but there's – the record is clear on this, and let there be no mistake about it. This defendant did not apply for cancellation of removal until March of 2002. That was all well after the fact. The date of the possession listed in Count II is December 21, 2001. And then he was later indicted in August 2002. As this Court knows from Felman Possession case, after-occurring events have no effect on what happens at the time. You have to look at the date of possession. And so we know that the application – he applied for cancellation of removal in March 2002. He did, in fact, receive it in August 2002. None of this has any bearing on his status in December 2001. And beyond that, another thing that counsel pointed out, she even admitted this isn't in the record, but she suggested that bail determinations often take into account eligibility for relief. I would say, one, yes, that's not in the record, and so I would dispute that.  As they point out in their brief, there's basically two provisions. The first one is in Title VIII of the United States Code, Section 1226. That basically gives the Attorney General the discretion to authorize release on bail pending removal hearings pursuant to guidelines that he will promulgate, he or she will promulgate. Then that happened in Chapter VIII of the Code of Federal Regulations. It's Section 236.1, sub c, sub 8. And when you look to that provision, there are only two criteria that are set forth for release. And these are standard criteria, whatever the context. One is the danger of risk of flight, and also the danger to the community. And it – besides that, then, it also is just common sense. I mean, he was granted bail. I think his removal proceedings were initiated in November or October 2001. He was granted release on bail pending his removal, like, two weeks later, November 8th. How could a judge have made any kind of a determination on the merits? They couldn't. The point – the point remains that release on bail is really just a courtesy. It shouldn't put this defendant in any better position, as Judge Nelson pointed out, than an alien who's not fortunate enough to bring up money to do bond, who is just simply remaining in INS detention. And beyond that, this is a point I want to make, too. It's an intriguing argument that the defense presents here, but if you look through the record, there is not – nowhere is there any affirmative authority for this position. I mean, I'm drawing inferences from the – the statutes that I just cited to you about what factors you draw on from – you draw on to determine whether to grant release on bail. And as Judge Nelson pointed out, yes, there is a circuit split. It was just two months ago or three months ago that the Tenth Circuit squarely addressed this issue. They rejected the idea that bond simply in and of itself renders somebody lawful. And I know the defense counsel raised an idea, well, maybe it wasn't presented right or maybe they didn't argue it. Here's a direct quote from page 1190 of that decision, footnote 9. The time he argues that he became authorized to be in the United States once removal proceedings were initiated and he posted bond, period. We disagree, period. And the Court went on to say it just doesn't make sense. It leads to absurd results, and that's an argument that we do want to stand behind. I mean, why on earth would Congress, at the moment it is taking steps to deport an unlawful alien from this country, allow himself to be armed? That makes no sense at all. And there's – I mean, that kind of argument applies throughout to defense's arguments. They also try to raise the presumption, well, you know what, he can't be found legally or unlawfully present until an immigration judge in fact orders him removed. Well, if that's true, that would give this statute an unbelievably narrow scope. That would mean that nobody could ever be prosecuted under this statute until they were ordered removed. Well, most of the time, when somebody is ordered removed, they're often deported the same day. So what purpose would that law have just in case they somehow escape from custody on the way to the border? It doesn't make sense, Your Honor. It doesn't make sense. It leads to absurd results, and it's also somewhat inequitable, because it will lead to arbitrary and capricious distinctions that one alien on one hand who is able to muster the resources to post bond is somehow treated differently than one who can't. For that reason, we would say a bond simply in and of itself, that's the issue that this Court, it is a question of first impression, except that we do have the Tenth Circuit now on the slate. And we'd also like to briefly point out the Eighth Circuit case of Vaz or God. It's analogous. It's not directly on point there. There was an unlawful alien. He applied for asylum. Pending asylum, he was given an employment authorization. And in fact, actually, he was also released. But the Eighth Circuit said, this employment authorization, just like the bond determination in the incident context, is not a determination on the merits. It's a courtesy. It promotes policy reasons. It preserves scarce resources. It overcrowded detention facilities. But it doesn't wipe away any preceding violations of status. And that's basically my pitch on the instruction. But it dovetails with the second argument, which is basically the judgment of acquittal. There's another thing I want to point out to this Court. I suppose one thing is that, particularly with the bond that's granted by the immigration authorities, we have a government pronouncement that the person can be released on bail, is lawful to be there, can't be deported. So why isn't he then, under the provisions of the public authorities, needlessly entitled to remain? Well, whether he's – I mean, I think the bond really allows him to remain here only so you can say unlawfully. I mean, his presumptive status is that he had no status. This is simply to allow him time to get an attorney to bolster his case. Nothing in the bond statutes gives an affirmative right to possess a firearm. Nothing on the face of the bond, which was pointed out in Excerpt to Record 969, nothing on its face gives the defendant any right to possess a firearm. I mean, that's the issue that I think is presented by this case in Count II, because it's specifically he has to be able to possess a firearm. And there's no case that I know of, and I look, and I know it's immigration things are very – get very difficult to research. I found nothing to support that. But then on the issue of the Rule 29, another thing that I want to make a point here, Your Honor, is that however you come out in the instruction, the facts of this case is undisputed that the defendant entered illegally in 1985, that he applied for temporary residency in 1988. In 1992, the INS gave him a notice for denying your claim. He appealed. May 26, 1995, the BIA, Bureau of Immigration Appeals, denied his appeal from the So at that point, he had exhausted his avenues to just his status. He was presumptively unlawful. Now, it turns out he must have fallen through the cracks. They didn't deport him right away. He stuck around, but he did so at his own peril. This was May 26, 1995, his appeals denied. He jumped forward 6 years to 2001. This is when the events underlying this indictment occurred. He's arrested at the Temecula checkpoint. They find out that he has a gun card on his person. Leads to the events of later discovery of the gun on December 21, 2001. No point from 1995 to 2001 is there any other application to adjust his status, filed or pending. And moreover, there was evidence at the trial the defendant himself admitted in 1998 he bought a fake green card for $250. So the reason I bring these facts up is let there be no doubt in this case this defendant knew that he had no status. He rolled the dice. He managed to stick around a few extra years. But then it caught up with him. But he had no status at the time he entered those removal proceedings. He knew he was unlawful. Buying a fake green card shows sort of a consciousness of guilt. And somehow now he wants this Court to find that by the courtesy of bail, he's suddenly lawfully here, can go out and of all things possess a firearm. I don't think it can be countenanced, Your Honor. But to move on then to the sentencing issue. In this case, the defendant points out, yes, it was their burden approved by the preponderance. But this is a factual finding. It's subject to the strict review of clear error. In this case, there are three independent reasons why the district court properly refused to give that adjustment. And first off, and most importantly, you have the number of firearms. There was evidence in the record that this defendant, since May 26, 1995, secured five other firearms. One of them was from the counter conviction, the Kimber pistol. The other ones were purchased in 1998, 2000, I believe 2001. In the record, the evidence showing this multiple gun ownership is overwhelming. And I sent up a letter, a 28-J letter, and I'll get to the Blakely issue too. This sort of mixes in with that. The evidence for the judge to find that he had multiple guns as relevant conduct was overwhelming. Not only did he admit twice in sworn testimony at trial that he possessed multiple guns, he even itemized, he said he bought seven since 9th, going all the way back to 1988. There was another question when he said, but you also bought three since May 26, 1995. Yes. And this plus two enhancement for the number of firearms, by the way, it only requires three to seven. So right there, we know that he has the one of the counter conviction, plus he's admitted that he's bought three others, which presumably includes that, since he was without a doubt unlawful. Not only does he admit this in his testimony, his councilman makes admissions. And these are judicial admissions, and under settled law that predates Blakely for decades, judicial admissions are binding. In absent egregious circumstances, a party is bound by the statements of his counsel. Defense counsel admitted to the district court, yes, he had purchased seven firearms. And I know defense counsel brought out, well, maybe if I'd known about Blakely, we wouldn't have made these admissions. That may all be well and fine, but this Court stands here to do justice. Those were the statements that were made. They can't be denied now. But even more importantly, that wasn't the only evidence. Defense counsel leaves out that at the sentencing hearing, Special Agent Michael Coate of the Department of Alcohol, Tobacco and Firearms testified. He testified under oath. He ran a query of the automated firearms system. It's a database. Testified, and he itemized every single gun that had ever been registered to the defendant, and I believe it did total seven. Not only did he provide that testimony, he introduced hard copies, the printouts of these purchases, and they're also in the back of the excerpts of record, really close to where that bond is. In the fifth volume of the excerpts of record, you'll see 10 or 15 pages. It's all printouts from that database. All of that together, Your Honor, it's overwhelming that this defendant possessed five guns when he was in an undoubtedly illegal status. When you look at Application Note 10, to the Guideline 2K2.1, it says the district court can examine a number of factors in deciding this adjustment. It doesn't say that if the defendant happens to satisfy more than less, he's automatically entitled to this adjustment. It doesn't give out any rules like that. It basically is a list. It's not exclusive. This is what the district court can consider. The very first thing in that list is the number of firearms. That's what the district court was concerned about, and justifiably. The district court says, well, if you have all these firearms, how do I know what you're doing with them? It leads me to an inference that maybe you're distributing them. Maybe you might even be selling them. But the burden's on you, and he continued the sentencing. There was three separate sentencing hearings in his case, Your Honors, August, September, and October 2003. And, in fact, a continuance was expressly given for the purpose to say, you know what, defendant, I want you to prove your case. And his case, in a nutshell, is as follows. He has maintained from day one in this litigation, I never had more than one gun at a time. I'm a gun enthusiast. I will get one gun, I will use it, I'll get tired of it, I'll see a new one, and then I'll go back to where I bought it, I'll trade it in, I'll get credit towards the purchase of a new one. And the district court says, okay, that's your theory, now prove it. If that's true, there ought to be records of that. You ought to have receipts on your end. The other thing we can take into account is gun sales, my goodness, regulated to the nth degree, there ought to be official records. In the six weeks that this was put over from the initial sentencing date, the defense never came up with one piece of paper to justify this theory. And I know the defense tries to characterize that as speculation on behalf of the judge. How could that be speculation? It's overwhelming evidence of multiple gun ownership. He wants to see the proof. The defendant has put a theory in play, I only own one at a time. Okay, fine, prove it. No documentation whatsoever. How can that be a clearly erroneous finding on behalf of the district court? You could be a little bit skeptical, I suppose, by the pattern of purchases, because he purchases a firearm on December 20th, 1998, and another one 11 days later. Absolutely. It sounds like a little outside his theory that he keeps them until he's tired of them and gets rid of them because he's got two in less than two weeks. We agree entirely, Your Honor, and that was the purchases from 1998, exactly. I mean, unless one is to infer that somehow the other guns he keeps for a year and he suddenly gets unhappy with one in an 11-day period, you're right. That also points to the facial credibility of the story. And the judge, this wasn't just hanging out in the periphery of the record. The judge made an express adverse credibility finding. After hearing all this evidence, after having a fully litigated sentencing hearing, the district court said, you know what, I don't believe this story. You've said it, I've given you the opportunity to prove it, you haven't proven it. And so for that reason, I mean, that was number one why that district court didn't err in going down to a six. But then we have two other brief points, Your Honors. Before you leave the Blakeley issue, your skirting Blakeley, I take it on a couple of grounds. One, the defendant's own testimony as to the number of weapons he had. And two, you've got the you had another point on the judicial admission by the lawyer. Have you found a Federal court has accepted either of those as a way around Blakeley? I mean, obviously, if he stipulates to it in the plea agreement, that's been found enough. But is testimony or statements of counsel enough to get around Blakeley? Have you found a case? I haven't, Your Honor. I haven't. And you're right, that will be an issue. Exactly. I know, I think there are cases where the admission was in the four corners of the plea agreement. And so without doubt, that would seem to fall under the rule. It is our position that we are asking the Court to make an extension to get to that conclusion. But one thing that we do think we have in our favor is plain error review. And that's the one thing we have to keep in mind. That's the lens we're looking through here. Well, the problem is, of course, Blakeley doesn't get to plain error. Blakeley gets to who makes the decision. And I can see an argument in your case that if this issue had been presented to the jury, I can't imagine a defense lawyer that wants to present this kind of an issue to the jury. But if it had been, the jury didn't have to believe this guy. And I take it they could also hate the lawyer and not accept the in-court admission. So to say that those things are in the record doesn't really remove it from the question of whether or not the jury still had to make the decision. Well, true. But then you know what I would say to that, Your Honor? United States v. Cotton, decided by unanimous Supreme Court two years before Blakeley. Blakeley didn't write off the books, all the plain error jurisprudence that came before it. Cotton was an apprendi case. And if I could summarize that briefly, it was where drug quantity, it was all about drug quantity. A big narcotics conspiracy. I believe they got 30-year sentences. The Court, Supreme Court unanimously, including the same Justice Scalia who authored Blakeley two years later, found that that didn't warrant reversal on plain error review. Even though quantity wasn't alleged in the indictment, even though it wasn't found by a jury, and in that case, even though it wasn't actually admitted by the defendants. And they said, why? Because on plain error review, we look to the record. As long as evidence is overwhelming and essentially uncontroverted, those seem to be the twin pillars, we can conclude justifiably that reversal isn't warranted. And especially under sort of that fourth, what I call the fuzzy prong of the plain error review, which is so long as it doesn't affect the judicial, the reputation or the integrity of judicial proceedings, there's no reason for reversal. So in that case, they look simply at the testimony, I believe, of seizing agents to say, well, in this case, we seized X kilograms of drugs. Defendants never challenged that. And the Supreme Court said unanimously, in an apprendee challenge context, which is basically what Blakeley is, no grounds for reversal. Here, we actually have admissions. We have admissions by the defendant, not just that. We have admissions by the lawyer. You can't get out from an admission by a lawyer on appeal unless we're going to change the rules of judicial admissions. And then in addition to that, we have the testimony of the special agent. Except that Blakeley did say it had to be admitted to by the defendant. Okay. But I would say, you know, it is a bit of a legal fiction what a judicial admission is, but it's an admission that's imputed to the defendant. So maybe it's still an open question if it literally has to come out. But it could be, and probably the safer thing is to wait and see how the Supreme Court rules on the cases they heard yesterday. Yeah, they've had 24 hours to think about it. One of the other things is, in considering the applicability of Blakeley, is what if the Supreme Court finds that their sentencing guidelines are unconstitutional? Two months later, they'll be coming down the pipe. I don't want to see. So that's a possibility. Absolutely. Who knows? But I mean, I'm just, and I know I just have 30 seconds, I'm just, the thing about this case, though, is, I mean, you really have overwhelming evidence. And I mean, even the defense itself, when they're admitting from the mouth of both the defendant and the lawyer, was never in dispute that there was this multiple gun ownership, then I don't think this Court should be troubled by the plus-two on Blakeley grounds. And unless there are any further questions, I would submit. Thank you, counsel. I think you have a few minutes. Ms. Bettencourt. Thank you, Your Honor. Your Honor, to address his response to the main issue in this case, we're not arguing that Mr. Bromwimewski should be found to be lawfully present in the United States for all purposes. The only thing that we are arguing is that he should be considered to be in the country with authorization at the point he's given that bond and released onto the street. That's all we're arguing, that for purposes of 922g5, he is present in the country with authorization. With respect to the downward adjustment for 2K2.1b2, government counsel says that there's overwhelming evidence, and that the evidence that the Court – there was overwhelming evidence on the part of Mr. Bromwimewski as to what he was using those firearms for, that the Court almost discounted that evidence. All he focused on is this distribution. But if you look at the language of 2K2.1b2, it says whether the – if the defendant possessed all ammunition and firearms. So what I would ask, Your Honor, to look at is, at the time he possessed these firearms, what was he doing with them? He was going to shooting ranges. His wife testified to that. His friend, Mr. Contreras, testified to that. There was receipts introduced as to the shooting ranges that he attended. And then the documentation that was presented by the government that is in the ER, I think the final pages of the ER, that evidence was questioned even by the district court. Even though the district court came up with his timeline as to when these purchases were made, the district court itself stated that it didn't prove or disprove what had happened to these guns after the fact. Agent Cody does say that there could have been other indications that they were sold to other people, and that's in the ER, and that's, I believe, at 913-1215. It doesn't show whether, in fact, it was sold back to the stores. And then the evidence that was presented, all that evidence was at the sentencing hearing. I think the rules of evidence are much more lenient. During sentencing hearings, there were objections as to hearsay and to foundation on those records. Those records, turning to the Blakeley argument, were not presented at the trial phase. There were statements by Mr. Robomuskis, but again, as to the possession of the guns, there wasn't any evidence by the government during the trial phase as to the number of guns. And so the district judge make an adverse credibility finding in his findings? Your Honor, his credibility findings went back and forth. On the record, he states at ER-935, he specifically says, see, I think he does use them at the sporting range, doesn't use them for illegal purposes, he uses them at a sporting range. But that is not the sole purpose, I think, that he purchased them for. I don't think you disprove he purchased them for sale to other people. Now, again, it doesn't he goes back and forth on whether he did not believe that Mr. Robomuskis didn't know he was in the country unlawfully. And that was the first count of conviction. And the jury themselves were split on that. The judge did make a finding with regards to whether he knew he was unlawfully in the United States. But with respect to him possessing the guns for sporting purposes, I think the court on other instances goes back and says that he does believe that he was using them solely for or that he was actually going to the shooting range. So I think the district court itself is going back and forth and is putting this question to Mr. Robomuskis, show me where these guns are. And even the evidence that was provided by government counsel didn't really show one way or the other whether, in fact, he was selling them to other people. So with that, Your Honor ---- Kennedy. I have a question, though, about what he's doing with these weapons, shooting range or not, where he buys two in 11 days. Yes, Your Honor. Isn't that a ground, you know, district court's looking at everybody making a decision. Isn't that ground for going past skepticism and saying, I just don't believe it's solely sporting purposes? Well, again, I think it's speculative, Your Honor. Just like it's speculative, he could have taken two guns to the sporting range. I mean, if we're ---- it's not clear on the record what he had done with those guns specifically, but if we're speculating as a district court did, he could have had two guns at one time. And the district court itself says, had he had all these at the same time going to the shooting range, he would have been eligible for the reduction. All right. Thank you very much, counsel. Thank you. Excellent argument on both sides. And U.S. v. Brava-Musquiz is submitted, and we'll take up U.S. v. Avangano. Thank you, Your Honor.
judges: Hug, T.G. Nelson, Wardlaw